UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISA ALI ABDULLA ALMURBATI, et al.,   :
                                      :
            Petitioners,              :
                                      :
                                      :   Civil Action No. 04-1227 (RBW)
GEORGE WALKER BUSH, et al.,           :
                                      :
            Respondents.              :
_____:

**MEMORANDUM OPINION**

     Currently before this Court is the Petitioners' Motion for Preliminary Injunction [D.E. # 101] ("Pets.' Mot."), which seeks an Order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, that would prohibit the respondents from transferring any of the petitioners from the United States Naval Base at Guantánamo Bay, Cuba ("GTMO") without first providing the Court and counsel with thirty days' advance written notice of such intended transfer, including notice of the location to which the respondents intend to transfer the petitioners. Pets.' Mot. at 1. Upon consideration of the motion, respondents' opposition thereto, the petitioners' reply, and arguments of counsel, the petitioners' motion must be denied. However, so that the Court is kept abreast of the petitioners' detention status, it will require the respondents to submit a declaration to this Court advising it of any transfers and certifying that any such transfers or repatriations were not made for the purpose of merely continuing the petitioners' detention on behalf of the United States or for the purpose of extinguishing this Court's jurisdiction over the petitioners' actions for habeas relief for a reason unrelated to the decision that the petitioners' detention is no longer warranted by the United States.[1]

---

[1] An Order consistent with the Memorandum Opinion is being issued contemporaneously herewith.

**I.     Background**

Petitioners are six Bahraini nationals who have been classified as "enemy combatants" by the respondents and are being detained at GTMO.[2]  As provided in their Petition for Writ of Habeas Corpus, filed with this Court on July 22, 2004, the petitioners maintain that they are being "detained in violation of the Constitution, treaties and laws of the United States." Memorandum of Law in Support of Motion for Preliminary Injunction Enjoining Respondents from Transfer of Petitioners from Guantánamo Bay Without Advance Notification to Counsel ("Pets.' Mem.") at 3.  The respondents moved to dismiss the petitioners' habeas petitions and this case, along with several other cases before other judges of this Court, was transferred to Judge Joyce Hens Green for purposes of having common issues raised in the several cases collectively addressed by one judge.  Ultimately, Judge Green denied in part and granted in part the respondents' motion.  See In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 443 (D.D.C. 2005).  Judge Green subsequently issued an order certifying her rulings for interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit and staying the proceedings pending resolution of the respondents' appeal.

In the past several months, there have been a number of media reports concerning earlier transfers of detainees by the United States to countries where they were allegedly subjected to "inhumane interrogations techniques" and the alleged anticipated transfers of current GTMO detainees to countries where they would be physically abused or tortured.  Pets.' Mem. at 4-6.  In

---

[2]The named petitioners who are detained are Isa Ali Abdulla Almurbati, Adel Kamel Abdulla Hajee, and Salah Abdul Rasool Al Bloushi.  The other three named petitioners are Mohamad Ali Abdulla Almurbati, Abdullah Kamel Abdulla Jajee, and Abdul Rasool Ali Al Bloushi, who have initiated this proceeding as next friends of the other three detainees.  When the Court refers to the petitioners throughout this opinion it is referencing not only the named petitioners who are in detention, but also the unnamed detainees on whose behalf this action has been filed.

addition, two of the petitioners have proffered their declarations wherein they represent that they have been told by unidentified "U.S. personnel" that they will be transferred to countries where they will be sexually abused or tortured. Id. at 2. Consequently, the petitioners have now filed the instant motion requesting an order from this Court prohibiting the respondents from transferring any of the petitioners from GTMO without providing thirty days advance notice to the Court and counsel. In response, the respondents contend that "the motion[] is based on rumors, myths, and hype that are refuted by sworn testimony of senior United States Government officials." Respondents' Memorandum in Opposition to Petitioners' Motions for Temporary Restraining Orders and Preliminary Injunctions ("Resp'ts' Opp'n") at 5.

## II.    Scope of the Court's Authority

A necessary predicate for addressing the petitioners' motion is an evaluation of this Court's judicial authority to grant the petitioners' requested relief. Federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred to them by the Constitution and acts of Congress, and this authority cannot "be expanded by judicial decree." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, (1994); Friends of the Earth v. United States Envtl. Prot. Agency, 333 F.3d 184, 187 (D.C. Cir. 2003); Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487, 492 (D.C. Cir. 1984). As a consequence of this limitation, the Court must, in the first instance, assess its authority to provide the relief requested by a party. Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 41 (D.D.C. 2004). The petitioners assert that this "Court has the inherent power" to afford them the requested relief pursuant to the All Writs Act through the issuance of an injunction "to protect its jurisdiction," and "to preserve the status quo between the parties pending a final determination of the merits of [this] action." Pets.'

Mem. at 7 (citations omitted).

> The separation of powers doctrine lies at the heart of the structure of our constitutional structure of government. In establishing [our] three branches of government, the Legislative, the Executive, and the Judicial, the Framers [of the Constitution] conferred separate and distinct powers to each, together with correlative checks and balances, as a safeguard against the encroachment or aggrandizement of one branch at the expense of another.

United States v. Scott, 688 F. Supp 1483, 1488 (D.N.M. 1988) (quoting Immigration & Naturalization Servs. v. Chadha, 462 U.S. 919, 960 (1983) (Powell, J., concurring)). Moreover, courts must be mindful of the Article III proscription that they may not exercise "executive or administrative duties of a nonjudicial nature." Buckley v. Valeo, 424 U.S. 1, 123 (1976). The purpose of this rule is "to maintain the separation between the Judiciary and the other branches of the Federal Government by ensuring that judges do not encroach upon executive or legislative authority or undertake tasks that are more properly accomplished by those branches." Morrison v. Olson, 487 U.S. 654, 680-81 (1988). Thus, in deference to the Executive Branch, courts are reluctant to intrude upon the discretionary authority of the Executive in military and national security matters. Hamdi v. Rumsfield, ___ U.S. ___, ___, 124 S. Ct. 2633, 2647 (2004); Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988). Accordingly, the Supreme Court has acknowledged "the generally accepted view that foreign policy [is] the province and responsibility of the Executive." Egan, 484 U.S. at 529 (quoting Haig v. Agee, 453 U.S. 280, 293-94 (1981)). "As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." Id. at 529-30 (quoting United States v. Nixon, 418 U.S. 683, 710 (1974)). It is against this legal landscape that the Court must assess whether it can grant the relief requested by the petitioners.

**III.     The Petitioners' Motion for a Preliminary Injunction**

In determining whether to grant a motion for a preliminary injunction, the Court must consider four factors: (1) whether the petitioners have demonstrated that there is a substantial likelihood that they will prevail on the merits of their claims; (2) whether the petitioners have shown that they would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm" the other parties; and (4) whether awarding the relief is in the public interest. Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977) (citing Virginia Petroleum Jobbers Assoc. v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)); Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001). These factors should be balanced against one another and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). Thus, injunctive relief may be warranted "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." Id. However, a party seeking injunctive relief must "demonstrate at least 'some injury' . . . since '[t]he basis for injunctive relief in the federal courts has always been irreparable harm.'" Id. (citations omitted).

**A.     Irreparable Harm**

The petitioners allege that they "stand to suffer immeasurable and irreparable harm – from torture to possible death – at the hands of a foreign government like Pakistan, Afghanistan, Saudi Arabia or Yemen" if they are transferred to such a country. Pets.' Mem. at 7. They further contend that "[t]ransfer to another country, even if 'only' for continued imprisonment, also circumvents Petitioners' right to adjudicate the legality of their detention in this Court." Id.

Despite the petitioners' allegations – that they may suffer torture and possible death if transferred to certain countries – they have submitted no evidence in support of these assertions. Instead, the petitioners rely extensively on "a range of [allegedly] credible news reports," and statements from two of the petitioners in this case, to support their allegations. Pets.' Mem. at 4. For example, the petitioners cite an article authored by Douglas Jehl, entitled Pentagon Seeks to Transfer More Detainees From Base in Cuba, that appeared on page A-one of the March 11, 2005 edition of the New York Times. This article alleges that the United States Government is "contemplating 'a plan to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorist to prisons in Saudi Arabia, Afghanistan and Yemen.'" According to the petitioners, media reports have represented that "the U.S. Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." Pets.' Mem. at 4 (citing Jane Mayer, Outsourcing Torture, New Yorker, Feb. 14, 2005 ¶ 7).[3] Moreover, one petitioner alleges that he was told by an unidentified United States official at Guantánamo Bay that "he would be sent to a prison where he would be raped." Id. at 2 (citing Declaration of Joshua Colangelo-Bryan dated March 15, 2005 ("Colangelo-Bryan Decl.") ¶ 2). Another petitioner alleges that he was also told by an unidentified United States official at Guantánamo Bay that "he would be sent to a prison that would turn him into a woman." Id. (citing Colangelo-Bryan Decl. ¶ 3). Notably, however, the petitioners do not allege that these statements were made by officials who will play a role in determining where they will be sent upon their release.

---

[3] The petitioners also cite other articles as support for their positions. See, e.g., Rajiv Chandrasekaran & Peter Finn, U.S. Behind Transfer of Terror Suspects, Wash. Post, Mar. 11, 2002, at A1; Megan K. Stack & Bob Drogin, Detainee Says U.S. Handed Him Over for Torture, L.A. Times, Jan. 13, 2005, at A1.

Despite these admittedly disturbing news reports, and the allegations of the two petitioners, it is significant that in response the respondents have submitted declarations "refut[ing] the factual scenario that [the] petitioners portray." Resp'ts' Opp'n at 8. Specifically, the respondents state that "it is the policy of the United States, consistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." Resp'ts' Opp'n at 8 (citing Declaration of Matthew C. Waxman dated March 8, 2005 ("Waxman Decl.") ¶ 6).[4] To insure that such repatriations or transfers do not occur, the Department of Defense ("DoD") represents that it consults with other agencies and considers factors such as the particular circumstances of the proposed transfer, the country to which the transfer is being made, the individual concerned, and any concerns regarding torture or persecution that may arise. Id. (citing Waxman Decl. ¶¶ 6-7 & Declaration of Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶¶ 6-8).[5] Moreover, the respondents declare that the "United States seeks humane treatment assurances whenever continued detention is foreseen after transfer and pursues more specific assurances where circumstances warrant, including assurance of access to monitor treatment after transfer." Id. (citing Waxman Decl. ¶¶ 6-8). Thus, the Secretary of Defense approves a transfer with the involvement of senior United States Government officials, including Department of State officials most familiar with international

---

[4]Matthew C. Waxman is the Deputy Assistant of Defense for Detainee Affairs in the Department of Defense. Waxman Decl. ¶ 1.

[5]Pierre-Richard Prosper is " the United States Ambassador-at-Large for War Crimes Issues and has supervised the operation of the Department of State Office of War Crimes Issues . . . since July 13, 2001." Prosper Decl. ¶ 1. Ambassador Prosper directly advises the Secretary of State and formulates "[United States] policy responses to serious violations of international humanitarian law committed in areas of conflict throughout the world." Id.

legal standards and the conditions in the countries concerned.  Id. (citing Waxman Decl. ¶ 7 & Prosper Decl. ¶¶ 7-8).  Additionally, the respondents maintain that the DoD will not transfer an individual if any concerns about mistreatment of an individual in his home country or prospective destination country cannot be resolved.  Id. (citing Waxman Decl. ¶ 7 & Prosper Decl. ¶ 8.)

With respect to the petitioners' speculation that they may be transferred to countries other than their home country of Bahrain, the DoD represents that "of the over [200] transfers, both for release and for continued detention that have occurred over the years so far, those have all been repatriations back to the home country."  Transcript of Proceedings on the Petitioners' Motion for Preliminary Injunction held on April 5, 2005 ("Tr.") at 24.  Thus, the likelihood that the petitioners will be sent to a country other than their home country of Bahrain seems highly improbable.  And, the petitioners' counsel represented during the hearing on their motion that if the requested notices indicate that their clients would be transferred to Bahrain, "it is certainly more likely that there would be no further litigation."  Tr. at 29.  Moreover, the DoD maintains that even if the petitioners are transferred to third countries other than Bahrain, "all of [the same factors considered in a transfer to petitioners' home country] would be taken into account and [would be considered] in[] the Executive's ultimate decision as to whether a transfer would ultimately be appropriate."  Tr. at 25.

As previously stated, irreparable harm to the moving party is "the basis of injunctive relief in the federal courts."  CityFed Fin. Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)).  To obtain injunctive relief, the petitioners must show that the threatened injury is not merely "remote and speculative."  Milk Indus. Found. v. Glickman, 949

F. Supp. 882, 897 (D.D.C. 1996). Here, the petitioners have failed to show that their threatened injuries are not remote and speculative. Namely, they extensively rely on news reports and articles that suggest that the government is involved in a conspiracy to ship the Guantánamo Bay detainees to countries where they will be tortured and detained indefinitely at the behest of the United States. Moreover, there is no evidence in the record that supports the petitioners' allegations that they will be transferred to any country other than Bahrain or that they will be detained by the authorities in Bahrain if and when they are released by the United States. Additionally, the petitioners have not submitted any evidence that could lead this Court to conclude that the representations made by the DoD with respect to the transfer process are not true. To the contrary, the DoD has submitted declarations of high-level officials outlining the process by which transfers are made, along with assurances that detainees will not be subjected to torture, mistreatment, or indefinite detention at the behest of the United States.

It is clear that the underlying basis for the claims advanced by the petitioners is their basic distrust of the Executive Branch. And, the predicate for their distrust is based on nothing more than speculation, innuendo and second hand media reports. This is not the stuff that should cause a court to disregard declarations of senior Executive Branch officials submitted to the Court "under the penalty of perjury." Nor is the Court prepared to conclude, as the petitioners suggest, that the respondents are not doing what they indicate in their declarations submitted to this Court in the absence of evidence to the contrary. Thus, because the respondents directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit, this Court cannot conclude, on this record, that the petitioners would suffer irreparable harm if they are transferred from the

Guantánamo Bay facility.

With respect to petitioners' position that they will sustain irreparable harm as a result of this Court losing jurisdiction over their habeas petitions upon their transfers, the DoD responds that because "the courts have habeas jurisdiction to consider claims by detainees that [their] present custody by the United States is unlawful, does not carry with it the necessary corollary that the courts should stand in the way of decisions by the United States to end that custody in appropriate circumstances." Resp'ts' Opp'n at 12. They further contend that "[i]f the Executive determines, for whatever reason, that the Nations's security no longer requires it to detain a particular individual, then the obvious and natural thing to do is to end the detention." Id. at 13. On the other hand, the petitioners maintain that the "[r]espondents should not be permitted to transfer [them] without [advance] notice and an opportunity to be heard by the detainee because to do so would prevent a [p]etitioner from vindicating his legal rights." Reply Memorandum of Law in Support of Motion for Preliminary Injunction Enjoining Respondents from Transfer of Petitioners from Guantánamo Bay Without Advance Notification to Counsel ("Pets.' Reply") at 6.

The ultimate objective of a habeas petition is release from custody. "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." Harris v. Nelson, 394 U.S. 286, 290-91 (1969); Abu Ali, 350 F. Supp. 2d at 30) (citing United States v. Morgan, 346 U.S. 502, 506 n.3(1954) (quotation omitted) ("The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights."). As the Supreme Court reiterated in Rasul, "at its core, the writ of habeas corpus has served as a means

of reviewing the legality of Executive detention, . . . ." Rasul, ___ U.S. at ___, 124 S. Ct. at 2692 (quoting INS v. St. Cyr, 533 U.S. 289, 301 (2001) (citing Brown v. Allen, 344 U.S. 443, 533 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial.")))

      Here, the respondents represent that "[w]hen the [DoD] transfers detainees to the control of other governments, the detainees are no longer subject to the control of the United States . . . ." Resp'ts' Opp'n at 8. Indeed, "[i]n order to maintain a habeas corpus action, the petitioner must be 'in custody.'" Abu Ali, 350 F. Supp. 2d at 47 (quoting Steinberg v. Police Court of Albany, N.Y., 610 F.2d 449, 453 (6th Cir. 1979)) . And the "custody must be the result of the respondent's action from which [a detainee] seeks habeas corpus relief." Id. Although the Supreme Court has attached a liberal construction to the custody requirement for purposes of habeas corpus, for example, finding it unnecessary for a petitioner to be in actual physical control of the respondent to be considered in the respondent's custody, for a sovereign to be considered in custody of a person over whom it does not exercise "physical control," a court must be able to conclude that the sovereign is in "actual or constructive custody" of the petitioner "within the meaning of the habeas statute" as a result of the respondent being "responsible for significant restraints on the petitioner's liberty." Id. at 48 (citing Hensley v. Mun. Court, 411 U.S. 345, 351 (1973) ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty") (additional citation omitted)). And such a finding can be made if a respondent is "working through an intermediary or an agent to detain [a] prisoner." Id. At bottom, as the Sixth Circuit has stated:

> In order to maintain a habeas corpus action, the petitioner must be "in custody." His custody must be the result of the respondent's action from which he seeks habeas corpus relief . . . It is enough that the imprisoning sovereign is the respondent's agent; that his liberty is restrained by . . . conditions [imposed by the respondent]; or that he can point to some continuing collateral disability which is the result of the respondent's actions.

Steinberg, 610 F.2d at 453 (citations omitted). Nothing of this sort has been demonstrated by the petitioners here. Accordingly, this Court is compelled to conclude that the petitioners have failed to establish that they will be irreparably harmed if and when the respondents decide to transfer them from United States custody.

### B. Substantial Likelihood of Success on the Merits

The petitioners claim that they are likely to succeed on the merits because "Judge Green has already ruled that Petitioners have stated actionable claims under the Due Process Clause . . ."[6] Pets.' Mem. at 8. According to the petitioners, "[f]or the respondents to move petitioners to countries that would afford no such protections would be to flout Judge Green's ruling and defeat the Court's jurisdiction." Id. Additionally, the petitioners claim that "[a]ny such transfer would also violate basic international legal norms embodied not only in the Geneva Conventions, but also in the International Covenant on Civil and Political Rights and the Convention Against

---

[6] Judge Green, in recognizing that the petitioners have protection under the Due Process Clause of the Fifth Amendment, stated:
> there can be no question that the Fifth Amendment right asserted by the Guantánamo detainees in this litigation – the right not to be deprived of liberty without due process of law – is one of the most fundamental rights recognized by the U.S. Constitution. In light of the Supreme Court's decision in Rasul, it is clear that Guantánamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply.

In re Guantanamo Detainee Cases, 355 F. Supp. 2d at 464. However, Judge Green's analysis of the detainees entitlement to due process was specifically limited to its application "to the government's determinations that [the detainees] are 'enemy combatants.'" Id. at 465. Moreover, Judge Green's ruling with respect to the potential violations of the Geneva Convention was restricted to detainees who were "Taliban Fighters." Id. at 479. The petitioners do not allege that they are Taliban detainees and therefore Judge Green's ruling concerning potential Geneva Convention violations does not apply to them.

Torture and Other Cruel and Degrading Treatment and Punishment." Id.

The petitioners posit, however, that pursuant to the All Writs Act "the Court has the inherent power 'to issue injunctions to protect its jurisdiction.'" Pets.' Mem. at 7 (citing SEC v. Vision Communications, Inc., 74 F.3d 287, 291 (D.C. Cir. 1996); Envtl. Def. Fund v. EPA, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973)). And the petitioners assert that their "request meets the most fundamental purpose of preliminary injunctive relief, 'to preserve the status quo between the parties pending a final determination of the merits of the action.'" Id. However, the All Writs Act becomes inapplicable once the respondents release the petitioners from United States custody because they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction. Nonetheless, even though the petitioners are seeking habeas relief,[7] they also now desire to have their release delayed for thirty days even if the respondents are affording them what they profess they want. Such delay conflicts with the purpose for seeking habeas relief, in the absence of proof that the release is a sham and that control over a petitioner is in some manner being retained by the respondents. Indeed, "[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty." Abu Ali, 350 F. Supp. 2d at 48 (quoting Hensley, 411 U.S. at 351); see also Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 894 (2d Cir. 1996) (habeas jurisdiction exists not just in physical custody by the executive but in all circumstances in which "federal adjudication is necessary to guard against governmental abuse in the imposition of severe restraints on individual liberty"). Thus, it is

---

[7] Although the petitioners seek other relief, none of the additional relief requested has bearing on whether restrictions should be imposed on the respondents' authority to transfer the petitioners from United States custody.

abundantly clear that the habeas statute requires that the petitioner be in custody for this Court to exercise jurisdiction.  See 28 U.S.C. § 2241(c).

Here, if and when any of the petitioners are unconditionally released from United States custody, this Court will be divested of its habeas jurisdiction as to such respondent.  And if thereafter a respondent remains in custody in the country to which he is transferred, such "subsequent confinement in the receiving country [will be] a function of the receiving government's law enforcement or prosecution interest or other reasons based on the domestic law of the receiving government."  Resp'ts' Opp'n at 8 (citing Waxman Decl. ¶ 5).  This reality is not altered by the petitioners' purely speculative and unsupported argument that the respondents are releasing them for the purpose of stripping this Court of its jurisdiction, in the face of the respondents' declaration that "there [is no] plan to effect transfers of GTMO detainees in order to thwart the actual or putative jurisdiction of any court with respect to the detainees."  Resp'ts' Opp'n, Second Declaration of Matthew C. Waxman dated March 16, 2005 ¶ 4.  Thus, on the record currently before this Court, the All Writs Act does not provide a basis for this Court to interfere with the respondents' prerogative to release any of the petitioners once they decide that the petitioners' detention by the United States is no longer necessary.  Thus, the petitioners are unlikely to succeed on their claim that this Court has authority, pursuant to the All Writs Act, to delay the respondents' transfer to another country once a decision for release is made by the respondents.

To conclude otherwise would violate the separation of powers doctrine.  In the context of the situation now before the Court, requiring the respondents to provide notice as requested prior to carrying out the transfer of the detainees from Guantánamo Bay on the record before it, would

be tantamount to an unconstitutional encroachment on the authority of the Executive Branch to determine when it should continue to detain an individual it has no further interest in detaining. This Court simply does not have authority to require the Executive Branch to provide thirty day notices prior to effecting the transfer of the petitioners. As noted above, it is a fundamental principle under our Constitution that deference to the Executive Branch must be afforded in maters concerning the military and national security matters. Hamdi, ___, U.S. at ___, 124 S. Ct. at 2647 (citing Egan, 484 U.S. at 530 (noting the reluctance of the courts to "intrude upon the authority of the Executive in military and national affairs") (additional citations omitted)). Accordingly, because this Court does not have the authority to grant the relief requested, the petitioners have failed to satisfy the likelihood of success prong of the preliminary injunction standard.

      C.     **Substantial Injury to Other Interested Parties**

In deciding whether to award injunctive relief, the Court must assess whether issuing an injunction would substantially injure other interested parties. The respondents state that "the presence of an injunction, . . . in the form of . . . an advance-notice requirement to set the stage for future judicial intervention, would "result in considerable harm to the United States and to the public interest." Resp'ts' Opp'n at 22. According to the respondents, such "intervention in transfer and repatriation decisions would prevent the United States from speaking with one voice in its dealings with foreign governments, particularly when such intervention, as here, would be by as many as 14 different Judges in scores of cases." Id. The respondents also allege, inter alia, that an injunction "would cause foreign governments to become reluctant to communicate frankly with the United States concerning particular mistreatment or torture concerns . . . [,]" as

well as encumber and delay an already elaborate process leading up to transfers or repatriations. Id. at 22-23 (citing Waxman Decl. ¶ 8 & Prosper Decl. ¶¶ 9-10 & 12).  Additionally, according to the respondents, an injunction would "undermine the United States' ability to reduce the number of individuals under [its] control and [its] effectiveness in eliciting the cooperation of other governments in the war on terrorism."  Id. at 23 (citing Waxman Decl. ¶ 8 & Prosper Decl. ¶ 12). These are "weighty and sensitive governmental interests," see, Hamdi, ___ U.S. at ___, 124 S. Ct. at 2647, that surely trump the petitioners' interests concerning why they should not be transferred without advance notice, which as discussed above are based on innuendo, speculation and second hand media reports.  As such, the third prong of the preliminary injunction standard weighs in favor of the respondents.

      **D.**    **Public Interest**

Finally, the Court must consider whether granting the requested injunction implicates the public interest and whether it confers a benefit or produces harm.  Milk Indus. 949 F. Supp. at 897.  The petitioners contend that "public policy favors requiring [r]espondents to provide advance notice to counsel and the Court of any intended removal of any petitioner from the Court's jurisdiction."  Pets.' Mem. at 8.  They contend that "[n]o matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court and represented by counsel – be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely."  Id.  On the record before the Court, it is abundantly clear that the respondents have demonstrated that they have no intention of transferring the petitioners into the hands of those who might torture them, or to have them further detained on behalf of the United States

following any transfers. Rather, the respondents have established that the United States will act in compliance with its transfer and repatriation policy, which comports with the principles of the Convention Against Torture, as detailed in the declarations submitted by the respondents. Pets.' Mem. at 8 & Waxman Decl. ¶ 8.

**IV.    Conclusion**

For the foregoing reasons, this Court concludes that the Petitioners' Motion for Preliminary Injunction must be denied. To conclude otherwise, would amount to an unconstitutional infringement on the Executive Branch's authority to assess the propriety of when designated enemy combatants in the United States' ongoing battle against terrorism should be released. This conclusion is compelled because on the record put before the Court, the separation of powers doctrine precludes the Court from granting the relief requested by the petitioners.

**SO ORDERED** this 14th day of April 2005.

REGGIE B. WALTON
United States District Judge
