Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

FILED WITH
COURT SECURITY OFFICER
11/1/05
DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ISA ALI ABDULLA ALMURBATI, *ET AL.*, Petitioners, | |
| v. | Civil Action No. 04-1227 (RBW) |
| GEORGE WALKER BUSH, *ET AL.*, Respondents. | |

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dorsey & Whitney LLP
*Counsel for Petitioners*
250 Park Avenue
New York, New York 10177
(212) 415-9200

Center for Constitutional Rights
*Co-counsel for Petitioners*
666 Broadway, 7th Floor
New York, New York 10012

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS ..... 5

I. Physical Abuse of Mr. Al Dossari ..... 5

II. Mr. Al Dossari Has Been Subjected to Abusive Interrogations ..... 7
- A. Threats to Mr. Al Dossari and His Family ..... 8
- B. Religious/Sexual Humiliation ..... 8
- C. Interrogations Regarding Attorney/Client Communications ..... 11

III. Prior Suicide Attempts ..... 11

IV. The Military Isolates Mr. Al Dossari ..... 12
- A. Isolation in Camp Delta, [redacted] Block ..... 12
  - 1. Interactions with a "Psychiatrist" ..... 13
- B. Isolation in Camp Five ..... 13

V. The October 15, 2005 Suicide Attempt ..... 15

ARGUMENT ..... 17

I. Petitioners Make the Requisite Showing ..... 18
- A. Irreparable Injury ..... 18
- B. Mr. Al Dossari Is Likely to Prevail on the Merits ..... 19
  - 1. Mr. Al Dossari Has Fifth Amendment Rights ..... 19
  - 2. The Court's Authority Under the *Habeas* Statute, the Common Law and the All Writs Act ..... 20
  - 3. Mr. Al Dossari Seeks to Be Incarcerated Under Minimally Humane Conditions ..... 21
    - a. Telephone Calls to Family and Counsel ..... 22
    - b. A DVD from Mr. Al Dossari's Family ..... 23
    - c. Reading Material ..... 24
    - d. Exercise ..... 25
    - e. Cell Lighting ..... 26
    - f. Human Contact ..... 27
    - g. Independent Psychological Exam ..... 28
  - 4. Related Relief Is also Warranted ..... 29
    - a. Respondents Refuse to Provide Information on Mr. Al Dossari's Condition ..... 29
    - b. Respondents Refuse to Approve a Counsel Visit to Guantánamo ..... 31

II. There Is No Substantial Injury to Respondents ..... 32

III. Granting the Relief Sought Satisfies a Strong Public Interest ..... 33

IV. The Stay Does not Preclude the Relief Requested but, if Necessary, the Court should Modify the Stay ..... 34

CONCLUSION ..... 35

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

## TABLE OF AUTHORITIES

## CASES

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001)....................17

*Al-Joudi et al. v. Bush et al.*, No. Civ. A. 05-301 (GK), 2005 WL 774847 (D.D.C. October 26, 2005)....................18-19, 30, 33

*Al-Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004)....................21

*Associated Press v. United States Dep't of Defense*, No. 05 Civ. 3941 (JSR), 2005 WL 2348477 (S.D.N.Y. Sept. 26, 2005)....................31

*Associated Press v. United States Dep't of Defense*, No. 05 Civ. 3941 (JSR), 2005 WL 2065171 (S.D.N.Y. Aug. 29, 2005)....................31

*Bell v. Wolfish*, 441 U.S. 520 (1979)....................19

*Brogsdale v. Barry*, 926 F.2d 1184 (D.C. Cir. 1991)....................19

*Campbell v. McGruder*, 580 F.2d 521 (D.C. Cir. 1978)....................20

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)....................18

*Elrod v. Burns*, 427 U.S. 347 (1976)....................18

*Estelle v. Gamble*, 429 U.S. 97 (1976)....................19

*Farmer v. Brennan*, 511 U.S. 825 (1994)....................18

*Finney v. Hutto*, 410 F. Supp. 251 (E.D. Ark. 1976)....................28

*In re Grand Jury Subpoena, John Doe v. United States*, 150 F.3d 170 (2d Cir. 1998)....................20

*In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004)....................22, 23, 25

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005)....................19

*Harris v. Nelson*, 394 U.S. 286 (1969)....................21

*Johnson v. Avery*, 393 U.S. 483 (1969)....................21

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996)....................25, 26, 27

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

*LeMaire v. Maass*, 745 F. Supp. 623 (D. Or. 1990), *vacated on other grounds*, 12 F.3d 144, 1458-59 (9th Cir. 1993) .......... 26-27

*Marsh v. Johnson*, 263 F. Supp. 2d 49 (D.D.C. 2003) .......... 34

*McCall v. Swain*, 510 F.2d 167 (D.C. Cir. 1975) .......... 20

*Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953) .......... 20-21

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) .......... 18

*Rhodes v. Chapman*, 452 U.S. 337 (1981) .......... 20

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) .......... 17

*In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001) .......... 20

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) .......... 25

*U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953) .......... 18

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) .......... 18

*Wilkinson v. Austin*, 125 S. Ct. 2384 (2005) .......... 28

*Wilwording v. Swenson*, 404 U.S. 249 (1971) .......... 21

*Women Prisoners of District of Columbia Dep't of Corr. v. Dist. of Columbia*, 877 F. Supp. 634 (D.C. Cir. 1994), *vacated in part on other grounds by*, 899 F. Supp. 659 (D.D.C. 1995) .......... 19

**STATUTES**

28 C.F.R. §§ 431.11, 541.12, 548.12 .......... 25, 26

28 U.S.C. § 2243 .......... 20

**OTHER**

*Moore's Federal Practice 3d*, § 65.20 (2004) .......... 34

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ISA ALI ABDULLA ALMURBATI, *ET AL.*, Petitioners, | ) | |
| v. | ) | Civil Action No. 04-1227 (RBW) |
| GEORGE WALKER BUSH, *ET AL.*, Respondents. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

On October 15, 2005, in Camp Echo at the Guantánamo Bay Naval Base ("Guantánamo"), counsel found Petitioner Jumah Al Dossari hanging by his neck from a metal mesh wall in his cell and bleeding profusely from a gash to the inner arm. Mr. Al Dossari did not respond when counsel called his name repeatedly and he appeared to be unconscious. Counsel summoned help, and military police ("MPs") arrived.[1] The MPs opened the door to the cell and cut the noose by which Mr. Al Dossari was hanging. MPs laid Mr. Al Dossari on the floor. Mr. Al Dossari did not seem to be breathing. Shortly thereafter, as counsel was leaving the room on MPs' orders, it appeared that Mr. Al Dossari gasped for air.

Just moments before this incident, counsel was speaking with Mr. Al Dossari in a small meeting area immediately adjacent to Mr. Al Dossari's cell. The cell and the meeting area are in the same room (the "Interview Room") and are separated by the metal mesh wall from which Mr. Al Dossari hung himself. Counsel had exited the Interview Room and gone outside, leaving

[1] The term MPs is used herein to refer to those who serve as guards in Guantánamo.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Mr. Al Dossari with two MPs, who were responsible for moving him from the meeting area to the cell so that Mr. Al Dossari could use the toilet located in the cell.

Shortly after counsel exited, the two MPs left the Interview Room as well, having moved Mr. Al Dossari into the cell. Several moments later, counsel re-entered the Interview Room and found Mr. Al Dossari hanging from the cell side of the mesh wall, bleeding on himself and the floor.

This was not Mr. Al Dossari's first suicide attempt at Guantánamo. In fact, an earlier suicide attempt was described by Mr. Al Dossari to counsel, and also in a book written by a former Guantánamo military intelligence soldier. According to Mr. Al Dossari and the soldier, Mr. Al Dossari cut his wrists with a razor in the shower. Before collapsing, Mr. Al Dossari used his blood to write on the wall of the shower, "I committed suicide because of the brutality of my oppressors." According to Mr. Al Dossari, and as corroborated by this soldier, Mr. Al Dossari attempted to kill himself on other occasions as well.

Several military personnel approached counsel following the October 15, 2005 incident and asked why Mr. Al Dossari had attempted to kill himself. The answer to this question plainly is found in the conditions under which the military has forced Mr. Al Dossari to live for the past four years – and in particular for the past two years. These conditions are inhuman even by the standards (or lack thereof) that have come to be accepted for those held at Guantánamo, and are a direct cause of Mr. Al Dossari's psychiatric distress and suicidality.

The military has held Mr. Al Dossari in Camp Five since May 2004; for the five months prior to his transfer to Camp Five, Mr. Al Dossari had been kept in isolation in Camp Delta's [redacted] Block. In Camp Five, the military confines Mr. Al Dossari to his cell almost always. From his cell, Mr. Al Dossari can see no other detainees. He cannot speak with other detainees except

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

by shouting, but often is unable to do even this due to the noise generated by large industrial fans that run in the corridor outside his cell. As such, Mr. Al Dossari spends day after day and night after night almost completely isolated from human contact.

Typically, the military allows Mr. Al Dossari to leave his cell only for one hour (or less) of exercise per week, rare showers and occasional interrogations. However, military personnel are able to ensure that Mr. Al Dossari is isolated even during these activities. For example, when he exercises, Mr. Al Dossari is generally kept alone in a small cage. For the past six months, military personnel have taken Mr. Al Dossari to the shower only once every five or six days and, although he used to be taken to the shower with other detainees, typically he is taken alone now.

In addition to being isolated from other detainees at Guantánamo, Mr. Al Dossari has been kept by the military from communicating in any meaningful way with his family. Mr. Al Dossari is not allowed to speak to his 10-year-old daughter, parents or siblings. The letters he receives from his family arrive long after they are sent, if they arrive at all, and typically are heavily censored.

Beyond isolating Mr. Al Dossari from other human beings, the military largely precludes Mr. Al Dossari from engaging in intellectual activity, going to lengths that would be farcical if they were not so damaging. The only reading materials that Mr. Al Dossari is allowed are the Koran, legal mail and family letters.[2] Due to the fact that Mr. Al Dossari would like to learn to read English, counsel recently brought English/Arabic children's books to Guantánamo for delivery to Mr. Al Dossari after approval by the military. The titles counsel brought included *Jack and the Beanstalk*, *Beauty and the Beast* and *Cinderella*. Authorities at Guantánamo

---

[2] Mr. Al Dossari also was recently permitted to have an English-language soccer magazine brought to Guantánamo by counsel.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

returned these books to counsel stating, "these items were not cleared for delivery to the detainee(s)." No explanation was offered.

In sum, Mr. Al Dossari has been kept alone in a cell for nearly two years. The military has denied him any meaningful contact with people. The military has denied him proper exercise and intellectual stimulation. This is a recipe for psychological (and physical) disaster, and plainly Mr. Al Dossari has suffered greatly the effects of his deprivations. There can be no question that the inhuman conditions that the military has imposed – and continues to impose – on Mr. Al Dossari have led him to attempt to kill himself on multiple occasions.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1, Petitioner Jumah Al Dossari respectfully moves for a temporary restraining order and preliminary injunction. By this application, Mr. Al Dossari does not seek to be released. He does not protest in his application that he has been detained for four years without charge and without being accused of engaging in violence. He does not even seek the privileges enjoyed by convicted murderers and rapists incarcerated in the United States. Rather, Mr. Al Dossari now seeks modest relief tailored to ease the physical, emotional and intellectual isolation in which he has lived for nearly two years.

As set forth in the accompanying Declaration of Stuart Grassian, M.D. ("Grassian Decl."), a Board Certified Psychiatrist, former Harvard Medical School faculty member, and expert in evaluating the psychiatric effects of solitary confinement, this relief is essential. Dr. Grassian warns that if Mr. Al Dossari's "conditions of confinement remain as they are, Mr. Al Dossari's mental state will likely continue to deteriorate and there will remain a great likelihood that he will again attempt to harm himself physically." Grassian Decl. ¶ 48.

Approved by DoD for public filing
November 4, 2005 .
Protected Information redacted in black

Frankly, it is scandalous and shameful that Respondents have not agreed to any measure, including those of the most limited nature, that might alleviate Mr. Al Dossari's condition.

## STATEMENT OF FACTS

Respondents have held Mr. Al Dossari at Guantánamo for nearly four years and have not charged him with any crime. During his four years at Guantánamo, Respondents have subjected Mr. Al Dossari to a range of horrific physical and psychological abuse. Even though the military has gone to great lengths to shield the Guantánamo operation from all scrutiny, these abuses have been corroborated in a number of respects by U.S. government personnel at Guantánamo.[3]

It would be overly burdensome for the Court if a comprehensive catalogue of the abuses that have been inflicted upon Mr. Al Dossari were presented herein. Therefore, only representative examples are addressed below to demonstrate the steady and unrelenting conduct of Respondents that compels the relief sought by this application.

### I. Physical Abuse of Mr. Al Dossari

In late April 2002, detainees were transferred from Camp X-Ray to the newly built Camp Delta. On the day of the transfer, while still in Camp X-Ray, Mr. Al Dossari exchanged words with an MP, resulting in the summoning of an immediate response force ("IRF").[4] Declaration of Joshua Colangelo-Bryan ("Colangelo-Bryan Decl.") ¶ 3, Exhibit B. A lieutenant at the scene

---

[3] It bears noting that Mr. Al Dossari described the events known to be corroborated by government personnel before the documents created by government personnel evincing such corroboration were publicly available.

[4] IRFs are the notorious "anti-riot" squads at Guantánamo. It was an IRF that beat Sean Baker, a Guantánamo MP who was posing as a detainee for training purposes, to the point that Mr. Baker suffered brain damage and can no longer serve in the military. When Mr. Baker was asked what the IRF would have done if he had been a real detainee, he replied, "I think that they would have busted him up . . . I've seen detainees come out of there with blood on them." *See* Steve Lannen, *Ex-Soldier Allegedly Beaten at Guantánamo,* Lexington Herald Leader, November 4, 2004, at b1. Colangelo-Bryan Decl. ¶ 3, Exhibit A.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

ordered Mr. Al Dossari to drop to his knees in anticipation of the IRF's arrival. In response, Mr. Al Dossari lay on the floor with his hands behind his back. *Id.*

The IRF stormed into Mr. Al Dossari's cell. An MP wearing full riot gear jumped in the air and landed on Mr. Al Dossari's back. According to other detainees who viewed this incident, the MP weighed approximately 240 pounds. *Id.* at ¶ 4, Exhibit B; Mr. Al Dossari is approximately 5' 6" and 120 pounds. *Id.* As two men held Mr. Al Dossari by his legs, the 240-pound MP began to choke Mr. Al Dossari, while a female MP joined that MP in repeatedly hitting Mr. Al Dossari's head to the floor. Mr. Al Dossari lost consciousness. *Id.*

The detainees who observed this beating included several who now live (in freedom) in the United Kingdom. According to a report written by these former detainees, the MPs removed Mr. Al Dossari from his cell on a stretcher following this beating, and cleaned the cell with water. The cell was so covered in blood that the water used to clean it turned red. According to these detainees, the MPs videotaped this entire event. *Id.* at ¶¶ 4-5, Exhibit B.

Erik Saar, a former Guantánamo military intelligence soldier, also discusses this incident in a recent book, ERIK SAAR AND VIVECA NOVAK, INSIDE THE WIRE (The Penguin Press 2005). Specifically, Saar writes that Mr. Al Dossari's face was "black and blue" from a beating delivered by an IRF on the day that MPs were transferring detainees from Camp X-Ray to Camp Delta.[5] Colangelo-Bryan Decl. ¶ 6, Exhibit C at 102. According to Saar, "[g]etting IRFed at X-ray meant receiving a good old-fashioned ass whipping, after which the lucky detainee would be

[5] Although Saar refers to detainees by pseudonym in his book, it is clear he is writing about Mr. Al Dossari. The author describes the detainee in question as a Bahraini as is Mr. Al Dossari. In addition, the author's descriptions of this beating and Mr. Al Dossari's suicide attempt (discussed above and below) are virtually identical to Mr. Al Dossari's descriptions of the same events.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

hogtied . . ." *Id.* Saar also writes that "the MPs had somehow lost the videotape" of Mr. Al Dossari's beating. *Id.*[6]

Sometime after this incident, a man identifying himself as an FBI agent and a man in a military uniform interrogated Mr. Al Dossari and asked him to explain the injuries that they observed. This interrogation was memorialized in a document that the military released in the context of FOIA litigation. The document is dated June 7, 2002 and describes an interview conducted with a Guantánamo detainee by an FBI special agent and a member of the Naval Criminal Investigative Service. While all names are redacted from the document, it reflects the author's interview with a detainee who describes a beating in terms that are essentially identical to Mr. Al Dossari's description. Most crucially, the document concludes by stating that the detainee had "what appeared to be a recent wound on the bridge of his nose." Colangelo-Bryan Decl. ¶ 8, Exhibit D. Mr. Al Dossari has a scar on the bridge of his nose that he attributes to this beating.[7] *Id.* at ¶ 8.

## II. Mr. Al Dossari Has Been Subjected to Abusive Interrogations

Military authorities at Guantánamo have subjected Mr. Al Dossari to many psychologically damaging interrogations. Mr. Al Dossari has often noted that the clear objective

[6] It is notable that Sean Baker was told that the video camera filming his beating malfunctioned and that, therefore, there was no videotape of the incident. *See* Steve Lannen, *Ex-Soldier Allegedly Beaten at Guantánamo,* Lexington Herald Leader, November 4, 2004, at b1. Colangelo-Bryan Decl. ¶ 3, Exhibit A.

[7] Mr. Al Dossari also has a scar the size of a cigarette ember on his hand that he attributes to having had a cigarette extinguished on him by U.S. military personnel at Kandahar Air Base in Afghanistan. Mr. Al Dossari was held there after being transferred from Pakistan. Mr. Al Dossari also has a scar on the side of his face that he attributes to having had his head pushed to the ground on broken glass in Kandahar. Colangelo-Bryan Decl. ¶ 9.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

of the interrogations is to put mental pressure on him and that interrogators are successful in doing this. Colangelo-Bryan Decl. ¶ 10.

### A. Threats to Mr. Al Dossari and His Family

On one occasion while he was in Camp X-Ray, MPs brought Mr. Al Dossari to an interrogation room. There an MP trained a rifle directly on Mr. Al Dossari at close range, despite the fact that Mr. Al Dossari was shackled to the floor. *Id.* at ¶ 10.

On another occasion in Camp X-Ray, an interrogator in civilian clothing threatened to send Mr. Al Dossari to a prison with murderers, where he said Mr. Al Dossari would be raped. At a subsequent interrogation, an interrogator told Mr. Al Dossari that he was known to be a low-level al Qaeda soldier and that if he admitted this he would spend five to ten years in prison. If he did not confess, the interrogator said, Mr. Al Dossari would spend 50 years or perhaps the rest of his life in jail. *Id.* at ¶¶ 10-11.

Interrogators in Camp Delta have told Mr. Al Dossari that he will be killed or, alternately, detained in Guantánamo for the rest of his life. On many occasions, interrogators told Mr. Al Dossari that he would be sent to Saudi Arabia, Jordan, Egypt or Israel to be tortured. Interrogators have threatened to kidnap Mr. Al Dossari's only child and to attack his family. *Id.*

### B. Religious/Sexual Humiliation

During one interrogation in Camp Delta, an interrogator wrapped Mr. Al Dossari in Israeli and U.S. flags. The interrogator then asked Mr. Al Dossari for his opinion regarding the U.S.'s support of Israel. The interrogator told Mr. Al Dossari that a holy war was occurring, between the Cross and the Star of David on the one hand, and the Crescent on the other. *Id.* at ¶ 12. The FBI has corroborated the practice of draping detainees in Israeli flags. In one report, an FBI agent working at Guantánamo personally observed a "detainee sitting on the floor of the

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

interview room with an Israeli flag draped around him . . ." The agent wrote that he believed this was "a practice used by the DOD . . ." *Id.*, Exhibit E.

Interrogators have also used humiliating sexual themes with Mr. Al Dossari. In early September 2002, on a Saturday close to midnight, MPs brought Mr. Al Dossari to an interrogation room, shackled his feet to the metal ring in the floor and left him alone. *Id.* at ¶ 13. Hours later, a female interrogator and four soldiers wearing black masks entered the room. While one soldier filmed the scene with a video camera, the interrogator threatened that if Mr. Al Dossari did not admit to being a member of al Qaeda who had been involved in attacks on the U.S., she would show him something he would never forget. Mr. Al Dossari protested that he had no connection to al Qaeda or violent attacks. *Id.*

The soldiers began to shake metal chains they held menacingly and the female interrogator continued to threaten Mr. Al Dossari. Mr. Al Dossari became convinced that he was in serious danger and screamed in the hopes of attracting the attention of someone outside the room. The female interrogator laughed and told Mr. Al Dossari that because it was a Saturday night, nobody else was there. *Id.* at ¶ 14.

The interrogator ordered the soldiers to take Mr. Al Dossari from his chair and put him on the floor on his back. The soldiers did so and then attached a long chain to the handcuffs that Mr. Al Dossari had been wearing. The soldiers pulled this chain violently over Mr. Al Dossari's head, extending Mr. Al Dossari's arms painfully. At the interrogator's direction, one of the soldiers cut Mr. Al Dossari's clothing from his body with a scissors. *Id.*

The female interrogator then took off all of her clothing and stood over Mr. Al Dossari. She removed a tampon that she had been wearing, causing what Mr. Al Dossari understood was

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

menstrual blood to drip onto Mr. Al Dossari's genitals. Mr. Al Dossari pulled against his handcuffs so vigorously that his hands became blue. He spit at the interrogator. *Id.* at ¶ 15.

The interrogator smeared blood on Mr. Al Dossari's chest. She kissed a crucifix that she was wearing on a necklace and said, "this is a gift from Christ for you Muslims." Then, she smeared blood on Mr. Al Dossari's face. The interrogator put her clothes on and left. The entire episode was captured by the MP's video camera. Mr. Al Dossari was left naked on the floor for two to three hours. *Id.*

While incidents such as this may seem incredible, they are actually well documented. For example, in his book, Erik Saar described an interrogation he witnessed in which a female interrogator unbuttoned and put her hand into her pants, and then wiped what she claimed was menstrual blood on the face of a detainee. *Id.* at ¶ 16, Exhibit C at 225-228. The interrogator left the detainee lying on the floor of the interrogation room. According to Saar, the purpose of such tactics was to make detainees feel "too dirty and ashamed to go before God . . ." *Id.*, Exhibit C at 226.

The Pentagon itself has confirmed that these interrogation tactics were used with Pentagon approval. *See* Carol Leonnig and Dana Priest, *Detainees Accuse Female Interrogators; Pentagon Inquiry is Said to Confirm Muslims' Accounts of Sexual Tactics at Guantánamo*, Washington Post, February 10, 2005, at A1 ("wide-ranging Pentagon investigation . . . uncovered numerous instances in which female interrogators, using dye, pretended to spread menstrual blood on Muslim men . . ."); Neil Lewis, *Guantánamo Inquiry Cites Abuses,* New York Times, July 14, 2005 (according to testimony given by Lieutenant General Randall Schmidt to the Senate Armed Services Committee, wiping ink on a detainee and saying it is

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

menstrual blood is an approved interrogation technique). Colangelo-Bryan Decl. ¶ 17, Exhibits F and G.

### C. Interrogations Regarding Attorney/Client Communications

Interrogators have consistently questioned Mr. Al Dossari regarding his communications with counsel. Indeed, during the week in which Mr. Al Dossari first met with counsel in October 2004, interrogators questioned him with respect to the content of his communications with his attorneys. Since that time, Mr. Al Dossari has been told by interrogators in military and civilian dress that his lawyers are liars. He has also been interrogated regularly regarding the status of his *habeas* case, as well as his interactions with counsel. Interrogators also have said that they know what he has told his attorneys. Colangelo-Bryan Decl. ¶ 18.

## III. Prior Suicide Attempts

Mr. Al Dossari has attempted to kill himself on multiple occasions at Guantánamo. For example, on or around Christmas 2002, Mr. Al Dossari slashed his arm (between the forearm and bicep) with a razor in the shower. (Mr. Al Dossari has a prominent scar on this part of his arm, which is also where he cut himself on October 15, 2005). Before fainting, Mr. Al Dossari wrote on the wall of the shower in his blood, "I committed suicide because of the brutality of my oppressors." Colangelo-Bryan Decl. ¶ 20. In his book, Erik Saar described being called to the scene of this incident and translating Mr. Al Dossari's Arabic-language writing for the senior officer present. *Id.*, Exhibit C at 100.

This suicide attempt followed an incident on Christmas Day 2002, in which the head of shift banged on detainees' cells, yelling Merry Christmas and cursing Allah. Mr. Al Dossari began praying, after which the head of shift entered Mr. Al Dossari's cell, striking Mr. Al Dossari repeatedly and putting Mr. Al Dossari's flip-flops on Mr. Al Dossari's Koran.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Subsequently, a lieutenant entered Mr. Al Dossari's cell and he too hit Mr. Al Dossari. *Id.* at ¶ 21.

## IV. The Military Isolates Mr. Al Dossari

### A. Isolation in Camp Delta, [redacted] Block

From early 2004 until May 2004, authorities at Guantánamo held Mr. Al Dossari in isolation in the [redacted] Block of Camp Delta. During this five-month period, the military did not permit Mr. Al Dossari to leave his cell other than for a handful of interrogations and weekly showers. The cell was filthy and dark. Colangelo-Bryan Decl. ¶ 22.

When he was first brought to the [redacted] Block cell, Mr. Al Dossari found that the cell's faucet had been locked. Therefore, he was forced to ask MPs for water, which, when provided, was often dark in color with a very unpleasant odor. As a result, Mr. Al Dossari drank from the toilet in his cell when necessitated by thirst. *Id.*

After some time, Mr. Al Dossari began to receive five basins of water daily. However, this water also was often dark in color. When Mr. Al Dossari complained, an African-American female sergeant told him that MPs had spit in the water while chewing tobacco. *Id.* at ¶ 23.

During the first several months in [redacted] Block, military authorities did not give Mr. Al Dossari a mattress, blanket, or clothes other than shorts. They kept his cell at a very cold temperature, forcing Mr. Al Dossari to wrap a thin sleeping mat around himself. At one point, MPs gave pants to Mr. Al Dossari, but then took them away several days later. A corpsman told Mr. Al Dossari that a doctor had ordered that the pants be taken. In his fourth month in [redacted] Block, Mr. Al Dossari received a t-shirt. *Id.* at ¶ 24.

For the first two weeks in the [redacted] Block cell, Mr. Al Dossari was not provided with any toilet paper. Thereafter, he was given seven squares of toilet paper daily. *Id.*

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

1. **Interactions with a "Psychiatrist"**

During the first few months in [redacted] Block, a man who identified himself as a psychiatrist and who was known as "Dr. [redacted]" visited Mr. Al Dossari weekly. During this time, a sergeant told Mr. Al Dossari that Dr. [redacted] had ordered Mr. Al Dossari not to be given a mattress, additional clothing or toilet paper. Upon learning this, Mr. Al Dossari asked Dr. [redacted] for changes in his conditions of confinement. In response, Dr. [redacted] laughed. *Id.* at ¶ 25.

Approximately three months after being transferred to [redacted] Block, Mr. Al Dossari was being interrogated when Dr. [redacted] entered the interrogation room. He told Mr. Al Dossari that he was leaving Guantánamo and that he had come to say goodbye. He told Mr. Al Dossari, "I hope you have a terrible life. You're a criminal." *Id.*

On several occasions, an overweight white man with glasses, who identified himself as a psychiatric doctor (but who was not Dr. [redacted]), interrogated Mr. Al Dossari. An interpreter told Mr. Al Dossari that this man, who was in uniform, was with naval intelligence. Other interrogators, corpsmen and nurses told Mr. Al Dossari that this doctor was responsible for determining the manner in which interrogations could be conducted, including with respect to applying pressure on detainees. The doctor had extensive knowledge about Mr. Al Dossari's background and questioned Mr. Al Dossari regarding many issues, including Mr. Al Dossari's childhood. *Id.* at ¶ 26.

B. **Isolation in Camp Five**

In May 2004, the military transferred Mr. Al Dossari to Camp Five, where he has been held ever since. In Camp Five, Mr. Al Dossari is almost completely isolated from human contact. The door to Mr. Al Dossari's cell contains a small window made of a material similar to one-way glass that prevents Mr. Al Dossari from seeing through it. In addition, the window is

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

covered from the outside; MPs lift the cover to see into the cell. Therefore, Mr. Al Dossari can see no other detainees or even military personnel from his cell. *Id.* at ¶ 27.

There is central air conditioning in each of the four Camp Five blocks and in the corridors of Camp Five. However, the military has placed large industrial fans, which generate tremendous noise, in the corridors between the cells. Military personnel have told Mr. Al Dossari that the fans are employed on the orders of interrogators, in part to keep detainees from talking with each other. Thus, Mr. Al Dossari is able to communicate with nearby detainees only when the fans are turned off, and then only by shouting. *Id.* at ¶ 28.

The military typically allows Mr. Al Dossari to leave his cell for one hour (or less) of exercise per week, rare showers and occasional interrogations. However, military personnel ensure that Mr. Al Dossari is isolated even during these activities. During Mr. Al Dossari's brief periods of exercise he is generally kept alone in a small cage. For the past six months, Mr. Al Dossari has been taken to the shower only once every five or six days. Although he used to be taken to the shower with other detainees, typically he is taken alone now. *Id.* at ¶ 29.

Despite being confined to his cell almost always, Mr. Al Dossari is not even permitted to sleep properly. The three bright fluorescent lights in Mr. Al Dossari's cell illuminate the cell at all times. Military authorities keep the cell at a very cold temperature. Also, powerful cleaning agents are often placed on the floor outside the cell, making breathing difficult. *Id.* at ¶ 30.

In addition to being isolated physically from other detainees, Mr. Al Dossari is prevented by the military from communicating meaningfully with his family. Mr. Al Dossari has not been allowed to speak to his young daughter, parents or siblings since his arrival at Guantánamo nearly four years ago. Further, Mr. Al Dossari receives letters from family members long after

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

they are sent – if he receives them at all – and such letters are typically heavily censored. *Id.* at ¶ 31.

Beyond his nearly complete isolation from human beings other than MPs and interrogators, Mr. Al Dossari is largely precluded from engaging in intellectual activities. For example, while the military briefly permitted Mr. Al Dossari to have Arabic-language novels, he has not been allowed them since early 2005. Since that time, the military has allowed Mr. Al Dossari to have only the Koran, attorney-client letters, family letters and the odd magazine. In fact, the military rebuffed counsel's attempts to give Mr. Al Dossari English/Arabic children's books such as *Puss in Boots, Jack and the Beanstalk* and *Cinderella*; Mr. Al Dossari had requested these books in the hopes that he could learn to read English. Authorities at Guantánamo did not provide any explanation as to why Mr. Al Dossari would not be allowed to try reading these fairy tales, but simply returned the books to counsel stating, "these items were not cleared for delivery to the detainee(s)." *Id.* at ¶¶ 32-33, Exhibit H.

## V. <u>**The October 15, 2005 Suicide Attempt**</u>

On October 15, 2005, counsel met with Mr. Al Dossari in the Interview Room in Camp Echo. The Interview Room consists of a small meeting area and a smaller cell, and the two areas are separated by a mesh metal wall. At one point, counsel exited the Interview Room to allow MPs to move Mr. Al Dossari from the meeting area to the cell so that Mr. Al Dossari could use the bathroom. When counsel left the Interview Room, Mr. Al Dossari was sitting in a chair and shackled to the floor, and two MPs were with him. Shortly after counsel left the Interview Room, the MPs also exited the Interview Room. Colangelo-Bryan Decl. ¶ 35.

Several minutes later, counsel opened the door to the Interview Room to determine if Mr. Al Dossari had finished using the bathroom. Counsel saw a large pool of blood on the floor. Counsel looked up and saw Mr. Al Dossari hanging by his neck from the metal mesh wall on the

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

cell side of the Interview Room. Mr. Al Dossari was bleeding on himself and the floor, evidently from a serious gash to his inner arm (between the forearm and bicep). Counsel summoned help immediately and called Mr. Al Dossari's name loudly. Mr. Al Dossari did not respond and appeared to be unconscious. *Id.* at ¶ 36.

Several MPs arrived quickly. After locating the correct key, the MPs opened the door to the cell and began to cut the noose by which Mr. Al Dossari had been hanging. At counsel's urging, one MP attempted to lift Mr. Al Dossari to ease the tension on his neck. Upon severing the noose, the MPs laid Mr. Al Dossari on the floor. When counsel asked that Mr. Al Dossari's wound be bound, an MP replied that he did not have anything to use for that purpose. Thereafter, counsel was ordered to leave the cell. As he did, he saw Mr. Al Dossari appear to gasp for air. *Id.* at ¶ 37.

Within an hour of this incident, several military personnel told counsel that they wanted to determine what had caused Mr. Al Dossari to attempt suicide. Also at this time, Colonel Michael Bumgarner told counsel that Mr. Al Dossari was being taken to a hospital facility, and that efforts would be made to facilitate a visit by counsel with Mr. Al Dossari. Colonel Bumgarner said that, especially if Mr. Al Dossari were taken to the Naval Hospital, as opposed to the detainee hospital, a visit should not be problematic. *Id.* at ¶ 38.

At approximately 10:00 pm that evening, Lieutenant Commander De Alicante of the Staff Judge Advocate's office called counsel to report that surgery had been performed on Mr. Al Dossari's arm, and that Mr. Al Dossari was in stable condition at the Naval Hospital. The following day Lieutenant Commander De Alicante told counsel, on behalf of the "general," that if Mr. Al Dossari awakened and asked to see counsel, the general would consider the request. Counsel inquired as to whether it would be possible to ask Mr. Al Dossari if he wanted to see his

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

lawyer. Lieutenant Commander De Alicante said that this request would be relayed to appropriate personnel, but counsel heard nothing further on the subject. Ultimately, despite repeated requests, counsel was not permitted to see Mr. Al Dossari at the Naval Hospital during the rest of counsel's visit to Guantánamo. *Id.* at ¶¶ 39-40.

Counsel returned from Guantánamo on October 17, 2005. Guantánamo personnel provided updates to counsel regarding Mr. Al Dossari's condition on October 18 and 19, 2005. However, counsel's multiple subsequent requests for information regarding Mr. Al Dossari's condition made to appropriate personnel at Guantánamo and counsel for Respondents have been ignored. *Id.* at ¶¶ 41-42. As such, counsel is unable to provide information regarding Mr. Al Dossari's health to Mr. Al Dossari's family.[8]

## ARGUMENT

The Court may issue preliminary injunctive relief, including a temporary restraining order, pursuant to Rule 65 of the Federal Rules of Civil Procedure. In considering a request for preliminary injunctive relief, the Court weighs four factors: (1) whether the movant would suffer irreparable injury if an injunction were not granted; (2) whether the movant has a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction

---

[8] If Respondents contest this motion by disputing the factual basis for it, Mr. Al Dossari requests the Court to permit limited discovery of any records pertaining to relevant events.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, '"it will ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted).

**I. Petitioners Make the Requisite Showing**

Mr. Al Dossari will suffer irreparable injury if injunctive relief is denied, and is likely to prevail on the merits.

**A. Irreparable Injury**

To obtain injunctive relief, Petitioner need not establish that irreparable injury is certain. Rather, "[t]he necessary determination is that there exists *some cognizable danger* of recurrent violation, something more than the mere possibility. . . ." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added). Moreover, as the Supreme Court has noted repeatedly, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of fundamental constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable injury").

"Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi et al. v. Bush et al.*, No. Civ. A. 05-301 (GK), 2005 WL 774847, at *13 (D.D.C. October 26, 2005) (ordering government to provide information, including medical records, regarding force feeding of

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Guantánamo detainees). In *Al Joudi*, the Court stated, "where the health of a legally incompetent or vulnerable person is at stake, irreparable harm can be established. While Petitioners do not lack legal competence as children do, they are indeed vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantánamo and weakened physical condition." *Id.*, at *14.

Here, the threat to Mr. Al Dossari's psychiatric state and his life could not be graver or more immediate and there is far more than simply some danger of harm. Indeed, there is nothing more irreparable than death. As such, irreparable injury is easily established and this factor alone warrants granting the relief sought.

**B. Mr. Al Dossari is Likely to Prevail on the Merits**

**1. Mr. Al Dossari Has Fifth Amendment Rights**

This Court has already held that Mr. Al Dossari has enforceable rights under the Fifth Amendment. *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005). The Fifth Amendment guarantees to every individual detained, but not yet tried or convicted of a crime, conditions of confinement at least equal to and no worse than those guaranteed to convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979) (conditions that amount to punishment violate the Fifth Amendment); *Women Prisoners of Dist. of Columbia Dep't of Corr. v. Dist. of Columbia*, 877 F. Supp. 634, 665 n.38 (D.C. Cir. 1994), *vacated in part on other grounds by*, 899 F. Supp. 659 (D.D.C. 1995) (threshold for establishing a constitutional violation is lower for pretrial detainees than for convicted criminals); *Brogsdale v. Barry*, 926 F.2d 1184, 1190 (D.C. Cir. 1991).

Under these principles, conditions of confinement that are inconsistent with "evolving standards of decency" or "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," *see Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976), and do not afford the "minimal

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

civilized measure of life's necessities," *see Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), violate Mr. Al Dossari's Fifth Amendment rights.

**2. The Court's Authority Under the *Habeas* Statute, the Common Law and the All Writs Act**

The Court has inherent authority (and a duty) to take action necessary to protect Mr. Al Dossari's psychological condition and, resultantly, his life. This authority and duty arises from the *habeas* statute, the common law and the All Writs Act. At its most basic level this judicial responsibility to oversee the welfare of *habeas* petitioners flows from the *habeas* statute at 28 U.S.C. § 2243, which empowers the courts to compel the government "to produce at the hearing the body of the person detained." Incident to that power is a duty on the part of the Court to ensure that the life of the detainee is not jeopardized as to prevent his appearance in Court, if necessary. *Cf. In re Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998); *In re Soliman*, 134 F. Supp. 2d 1238, 1252-54 (N.D. Ala. 2001).

With respect to the common law, the District of Columbia Circuit Court has pronounced that the "common law . . . heritage" requires that detainees who have not been convicted of a crime be treated "with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." *Campbell v. McGruder*, 580 F.2d 521, 527 (D.C. Cir. 1978); *see also McCall v. Swain*, 510 F.2d 167, 184 (D.C. Cir. 1975) ("[i]t is simply anomalous to suggest that a court, whose duty it is to ensure that the full vitality of the Great Writ is preserved inviolate, could be precluded from exercising continuing oversight of the manner in which individuals it commits to custody are treated . . . ."); *Miller v. Overholser*, 206 F.2d 415, 419 (D.C. Cir. 1953) ("ordinarily *habeas*

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

*corpus* is a remedy to secure total release from custody," but writ is also available to test whether petitioner receives proper medical treatment).[9]

In *Harris v. Nelson*, 394 U.S. 286, 298 (1969), the Supreme Court held that "a district court may, in an appropriate case, arrange for procedures which will allow development . . . of the facts relevant to disposition of a *habeas* corpus petition." The Court explained that such proceedings are necessary in order to allow *habeas* petitioners "careful consideration and plenary process of their claims including full opportunity for presentation of the relevant facts." *Id.* at 299. Relying on the All Writs Act, the Supreme Court ruled that "when the Court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be heard," it "may . . . authorize such proceedings with respect to development . . of the facts . . .as may be necessary or appropriate in aid of [its jurisdiction]." *Id.* at 300; *see also Al-Odah v. United States,* 346 F. Supp. 2d 1, 7 (D.D.C. 2004) (court has authority "to craft the procedures necessary" to enforce Petitioners' right to counsel so Petitioners may "present the facts surrounding their confinement to the Court.").

**3. Mr. Al Dossari Seeks to be Incarcerated Under Minimally Humane Conditions**

For nearly two years, Mr. Al Dossari has spent virtually all of his time alone in a cell. From his cell, he can see no other human beings and is rarely able to speak with any other human beings. The military allows Mr. Al Dossari out of his cell for, at most, an hour of exercise a week, during which Mr. Al Dossari is alone. The military also allows Mr. Al Dossari to leave

[9] The Supreme Court has held that challenges to conditions of confinement are cognizable in *habeas*. *See Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (challenge by prisoners to living conditions and disciplinary measures were "cognizable in federal *habeas* corpus"); *Johnson v. Avery*, 393 U.S. 483 (1969) (challenge to denial of law books and typewriter cognizable in federal *habeas* corpus).

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

his cell for a shower (approximately every six days) and for interrogations. The only reading materials that Mr. Al Dossari is generally allowed are the Koran, attorney-client correspondence and old family letters. The lights in Mr. Al Dossari's cell are kept on continuously. Military personnel have beaten Mr. Al Dossari and subjected him to religious-based abuse. Interrogators have told Mr. Al Dossari that he will be confined in this manner for the rest of his life.

As could be anticipated easily, these conditions have had a severely destructive effect on Mr. Al Dossari's psychiatric health. In the words of Dr. Grassian, "Mr. Al Dossari's recent suicide attempt is the direct result of his conditions of confinement, including his nearly complete isolation from other human beings, the fact that he is not permitted to engage in appropriate intellectual activity, and the fact that he is not allowed reasonable physical exercise." Grassian Decl. ¶ 47. By this application, Mr. Al Dossari seeks to be allowed to interact with people, engage in limited intellectual activities and have regular, if brief, exercise periods to protect his mental and physical health. Respondents have not agreed to implement any of the measures addressed below. Colangelo-Bryan Decl. ¶ 45, Exhibit J.

**a. Telephone Calls to Family and Counsel**

Mr. Al Dossari should be permitted to have bi-weekly telephone calls with a member of his family, subject to reasonable security measures, and with counsel. Such phone calls are explicitly contemplated in "special circumstances" by the Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba (the "Access Procedures"). *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 190 (D.D.C. 2004). Although the Access Procedures provide no definition of special circumstances, it is difficult to imagine circumstances that cry out for permitting telephone calls more than those relevant here. Mr. Al Dossari's sense of hopelessness and isolation may well be eased by allowing him to speak with his family for the first time in four years. It also may well be

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

beneficial if Mr. Al Dossari's family has the opportunity to urge him not to harm himself. *See* Grassian Decl. ¶ 49.

Respondents cannot claim that allowing telephone communications between Mr. Al Dossari and his family would be harmful or overly burdensome. After all, the military already allows direct telephone communications between detainees at Guantánamo who have been charged with war crimes and their families. Mr. Al Dossari, who has never been charged with anything and is suicidal, should be entitled to at least as much.[10]

**b. A DVD from Mr. Al Dossari's Family**

Mr. Al Dossari should be permitted to view a DVD to be prepared by his family containing personal greetings, expressions of concern and a plea that Mr. Al Dossari not harm himself again. The viewing of DVDs by detainees is far from controversial. In fact, the Access Procedures expressly provide that communications from family members may – with the approval of military authorities – be brought to detainees to introduce counsel. *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d at 188. As such, the military has permitted many detainees to view DVDs containing introductory messages from family and, in fact, approved a DVD to be shown to another Petitioner in this case. Inexplicably, however, the military did not agree to counsel's request to allow Mr. Al Dossari to view a DVD, despite Mr. Al Dossari's critical and fragile state.[11]

---

[10] Mr. Al Dossari understands that reasonable conditions would be imposed on telephone calls (including monitoring for calls with family) by the military and approved by the Court for security purposes.

[11] Mr. Al Dossari understands that military authorities at Guantánamo would review any DVD for security purposes.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

**c. Reading Material**

Mr. Al Dossari should be permitted to have books beyond the Koran, which, not surprisingly, he has memorized while at Guantánamo. Colangelo-Bryan Decl. ¶ 32. More specifically, Mr. Al Dossari has expressed a desire to learn to read English and, in this vein, requested that counsel provide him with English/Arabic children's books. Counsel brought such books to Guantánamo for military approval, including *Cinderella*, *Beauty and the Beast*, *Jack and the Beanstalk* and *Puss in Boots*. The military returned these books to counsel with a post-it note that said simply, "these items were not cleared for delivery to the detainee(s)." *Id.* at ¶ 33, Exhibit H. Mr. Al Dossari should be permitted to have such books. In addition, Mr. Al Dossari should be permitted to have an introductory English/Arabic textbook.

Respondents have argued in the past that it is a security risk if detainees learn to speak English. While this argument is preposterous for many reasons,[12] it is inapposite here. Mr. Al Dossari has learned to speak English reasonably well at Guantánamo. Colangelo-Bryan Decl. ¶ 33, n.5. As such, providing Mr. Al Dossari fairy tales or a textbook that will allow him to engage his mind at least minimally can pose no security risk.

Mr. Al Dossari should also be permitted to have certain traditional religious texts and Arabic-language novels. As discussed, Mr. Al Dossari has a Koran and, in the past, was allowed to have Arabic-language novels. In light of these facts and Mr. Al Dossari's current condition, there is simply no reason why he should be denied such texts.

A Court order directing that Mr. Al Dossari be allowed to have children's books, religious texts and novels will not, in any fashion, effect a change in operations or create an

[12] For example, many detainees already speak English and, in part for that reason, it seems unlikely that military personnel are permitted to discuss classified or highly sensitive matters in front of detainees.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

undue burden at Guantánamo.[13] The Access Procedures already provide a mechanism by which counsel may submit non-legal written materials for approval and delivery to detainees; many items have been approved through this mechanism (although not *Cinderella* or *Puss in Boots*). *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d at 186; *see also,* 28 C.F.R. § 548.12 (U.S. Bureau of Prisons regulation providing that prisoners/detainees should be allowed to subscribe to and receive publications, including security-cleared newspapers, magazines, and books).

**d. Exercise**

The military presently allows Mr. Al Dossari to have 30 minutes to one hour of "exercise" per week alone in a cage. Mr. Al Dossari should be permitted to exercise (even if alone in a cage) for at least an hour daily, considering that lack of exercise and exposure to the outdoors has undoubtedly exacerbated Mr. Al Dossari's condition. Grassian Decl. ¶¶ 47-49.

Providing exercise to an individual who is detained is hardly a controversial notion. Courts and the U.S. Bureau of Prisons recognize that even those actually convicted of crimes are entitled to reasonable exercise. For example, in *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979), the court affirmed a district court's order directing a prison to "accord plaintiffs the right of outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs ma[ke] that impossible." The court found that outdoor exercise was required as an Eighth Amendment matter when prisoners were otherwise confined in small cells nearly twenty-four hours a day. *Id.*

In *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), the court reversed the granting of summary judgment to defendant where plaintiff alleged that the conditions under which he

---

[13] Mr. Al Dossari understands that military authorities at Guantánamo would review any book to ensure that its contents had not been altered in any fashion to include inappropriate material.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

exercised violated his Eighth Amendment rights. More specifically, plaintiff was restricted to exercising in a 8' by 21' by 16' space with a roof, three concrete walls, and a fourth wall of perforated steel admitting sunlight through only the top third. *Id.*; *see also* 28 C.F.R. §§ 431.11, 541.12; Department of Homeland Security ("DHS") Detention Operations Manual[14] (stating that prisoners/detainees should have an opportunity to take outdoor recreation no less than five days a week for a minimum of one hour per day and additional outdoor time at least three times a week for a minimum of one hour per day).

It is also worth noting that certain detainees at Guantánamo are permitted to exercise on a fairly liberal basis. In light of Mr. Al Dossari's condition there is no reason why he should not be granted exercise beyond the negligible amount he is now permitted.

**e. Cell Lighting**

Despite being confined almost constantly to his cell, it is very difficult for Mr. Al Dossari to sleep. A significant cause of Mr. Al Dossari's difficulty is that, generally, the military keeps the three bright fluorescent lights in Mr. Al Dossari's cell on at all times. There is no reason why the lights in Mr. Al Dossari's cell could not be at least dimmed (if not turned off) during sleeping hours. In fact, Mr. Al Dossari reported that when the military was attempting to end a hunger strike in July of this year, only one small light was kept on in his cell from 11:00 p.m. to 5:00 a.m. He reported that this made a tremendous difference in his ability to sleep. Colangelo-Bryan Decl. ¶ 30.

Although it may seem trivial to one who has never been subjected to constant artificial lighting, there is an established body of case law on this subject. In *LeMaire v. Maass*, 745 F.

---

[14] This manual relates to the detention of aliens during the immigration, asylum or deportation process.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Supp. 623, 636 (D. Or. 1990), *vacated on other grounds*, 12 F.3d 1444, 1458-59 (9th Cir. 1993), the court stated, "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." The *LeMaire* court found that plaintiff was entitled to permanent injunctive relief with respect to lighting. *Id.* at 643.

In *Keenan,* 83 F.3d at 1090-91, the court found plaintiff's evidence that large fluorescent lights that shone in his cell 24 hours a day and caused grave sleeping problems and psychological problems to be sufficient to reverse the granting of summary judgment to defendant on the issue of lighting. *See also* DHS Detentions Operations Manual, "Disciplinary Policy," § III.A.3 (lights and music in the cellblocks to be turned off at night so detainees can sleep); Grassian Decl. ¶ 50.

**f. Human Contact**

Mr. Al Dossari has been prevented from having any meaningful contact with human beings for nearly two years.[15] This isolation has been intolerable for Mr. Al Dossari and has had a severely negative effect on his mental health. In March 2005, while discussing with counsel the fact that he was not allowed to interact with others generally, Mr. Al Dossari asked, "what can I do to keep myself from going crazy?" Colangelo-Bryan Decl. ¶ 34. As such, Mr. Al Dossari should be incarcerated under conditions that allow for at least one hour of interaction with his fellow detainees daily. Grassian Decl. ¶ 47 ("in my opinion, Mr. Al Dossari's recent suicide attempt is the direct result of his conditions of confinement, including his nearly complete isolation from other human beings . . .").

[15] While counsel visits may be an exception to this rule, they are not frequent.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Mr. Al Dossari has a cognizable liberty interest – giving rise to a due process right – in not being confined in his current conditions, including isolation. In *Wilkinson v. Austin*, 125 S. Ct. 2384, 2394-95 (2005), the Supreme Court found that conditions of confinement by which human contact was prohibited, lights remained on continuously and only one hour of exercise per day was permitted constituted an atypical and significant hardship within a correctional context. The Court held that an inmate has a due process right in avoiding assignment to a prison where he would be incarcerated under such conditions. *Id.*

In *Finney v. Hutto*, 410 F. Supp. 251, 278 (E.D. Ark. 1976), the court held that with respect to isolation, "determinate sentences of no more than a prescribed number of days must be imposed," and that a maximum period of thirty days' isolation is permissible. *See also* DHS Detentions Operations Manual, Special Management Unit (Administrative Segregation), § III.D.8 (detainees to be permitted to socialize with other detainees for at least one hour per day).

**g. Independent Psychological Exam**

Counsel should be permitted to bring to Guantánamo an independent medical professional to assess Mr. Al Dossari's psychiatric condition. Respondents will undoubtedly oppose this request by relying on stock, generic statements such as those presented recently in a letter to counsel: "Guantánamo's provision of medical care includes appropriate mental health evaluation and care and Guantánamo is providing such care to Mr. Al Dossari. Guantánamo has a Behavioral Health Services staff . . . The staff provides a variety of mental health services, including management of self-injurious behavior." Colangelo-Bryan Decl. ¶ 45, Exhibit J.

Rarely have emptier words been written. The health services staff to which Respondents refer are, evidently, the same staff who knew Mr. Al Dossari had attempted to kill himself on multiple occasions, yet approved (or directed) his long-term placement in cells from which he cannot interact meaningfully with others. These staff, evidently, approved the denial of reading

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

materials to Mr. Al Dossari, including fairy tales. These staff, evidently, approved denying more than an hour of exercise per week to Mr. Al Dossari. Evidently these staff even permitted interrogators to sexually humiliate and threaten the life of Mr. Al Dossari. These are also the same staff who were bewildered as to the reasons why Mr. Al Dossari might attempt to kill himself in a place like Guantánamo. *Id.* at ¶ 38.

No qualified, well-intentioned mental health care professional would take such actions. Indeed, considering Mr. Al Dossari's psychiatric condition and the brutal treatment he has received, the only reasonable question is whether these staff are incompetent or dedicated to the interest of someone other than Mr. Al Dossari. Of course, another possibility is that Behavioral Health Services staff are well qualified and well intentioned, but have no authority to order changes in conditions of confinement or to prevent harmful conditions from being imposed.

Regardless, if the treatment of Mr. Al Dossari reflects the care provided by mental health staff at Guantánamo, the last thing Mr. Al Dossari needs is more such care. Rather, considering that Mr. Al Dossari has attempted to commit suicide on multiple occasions while under the putative watch of Behavioral Health Services staff, it is painfully clear that he is in critical need of an independent examination. Further, "given the conditions of [Mr. Al Dossari's] confinement and the nature of his interactions with the Guantanamo staff, it is not realistic to expect that he would be able to trust a government psychiatrist sufficiently to allow him to expose his psychiatric difficulties to such an individual." Grassian Decl. ¶ 53.

**4. Related Relief is also Warranted**

**a. Respondents Refuse to Provide Information on Mr. Al Dossari's Condition**

As discussed, since October 19, 2005, Respondents have ignored counsel's multiple requests for information regarding Mr. Al Dossari's health. There is no justification for such

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

gratuitous callousness, which prevents counsel from properly representing Mr. Al Dossari, and has left Mr. Al Dossari's family in a state of great anxiety. Further, when Respondents did provide information to counsel, it was not entirely credible. For example, on October 19, 2005, personnel at Guantánamo informed counsel that Mr. Al Dossari's "spirits [were] good," a seemingly unlikely condition for someone who had attempted to take his own life four days earlier. Colangelo-Bryan Decl. ¶ 41.

Due to Respondents' deplorable conduct in ignoring counsel's requests for information, it is requested that the Court order Respondents to provide information regarding Mr. Al Dossari, including with respect to the results of his surgery, his physical condition generally, his cognitive functioning and his current location (hospitalized or not). In addition, we request that counsel be provided with copies of all medical records relating to the October 15, 2005 suicide attempt, all medical records relating to prior suicide attempts by Mr. Al Dossari and all medical records relating to Mr. Al Dossari's psychiatric condition. The Court may well recall that Respondents refused to provide information regarding Petitioners' health with respect to a hunger strike before doing so at oral argument on a recent motion by Petitioners.

It is only through the provision of this information and these documents that counsel can properly represent Mr. Al Dossari. *See, e.g., Al-Joudi et al.*, 2005 WL 774847, at *17-18 ("in order to properly represent Petitioners, their counsel must . . . be made aware if their clients are in such fragile physical condition that their future ability to communicate is in imminent danger" because otherwise "their ability to present their claims to the Court will be irreparably compromised"). In addition, the provision of the requested information, hopefully, will have an ameliorative effect on the panic that Mr. Al Dossari's family is currently experiencing; we

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

concede that, as Respondents will undoubtedly point out, the emotional state of Mr. Al Dossari's family is of no direct legal relevance.

It is noted that, typically, Respondents oppose motions for medical records and information, in part, by citing their concern for the privacy rights of detainees. Without addressing the true nature of any such concern, this issue is moot.[16] Mr. Al Dossari provided to counsel (prior to the October 2005 visit) an authorization for the release of records relating to him. Colangelo-Bryan Decl. ¶ 43, Exhibit I.

**b. Respondents Refuse to Approve a Counsel Visit to Guantánamo**

In light of Mr. Al Dossari's obviously perilous condition and the fact that counsel was not permitted to see Mr. Al Dossari following the October 15 suicide attempt, counsel submitted a formal request to visit Guantánamo on November 11, 12 and 13, 2005. Counsel made this request on October 21, 2005. Despite the gravity of Mr. Al Dossari's condition, Respondents have not approved or denied this request, and have not represented that they will respond to it by any particular date.

There is no evident basis upon which this request would properly be denied. Based upon communications with other *habeas* counsel, it appears that attorneys from only one other law

[16] Courts have expressed skepticism with respect to Respondents' stated concerns for detainees' privacy rights. *See, e.g., Associated Press v. United States Dep't of Defense*, No. 05 Civ. 3941 (JSR), 2005 WL 2348477, at *1 (S.D.N.Y. Sept. 26, 2005) (In rejecting government's unsupported contentions regarding violation of detainees' privacy rights and ordering Department of Defense to ask whether detainees wished to have their identities made public, the court stated, "some might think it strange, even hypocritical, that the military officials who held the detainees incommunicado for so many months now express such solicitude for the detainees' privacy rights. . . ."); *see also Associated Press v. United States Dep't of Defense*, No. 05 Civ. 3941 (JSR), 2005 WL 2065171, at *2 (S.D.N.Y. Aug. 29, 2005) ("one might well wonder whether the detainees share the view that keeping their identities secret is in their own best interests.").

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

firm are scheduled to be at Guantánamo during this time. In light of this and the fact that counsel has visited Guantánamo with attorneys from two other firms on previous occasions, there should be no logistical concerns regarding the number of attorneys on the base. As such, counsel requests the Court's intervention. Counsel also seeks to be permitted to visit Mr. Al Dossari in the hospital if he remains there during counsel's visit; as discussed, before Respondents began ignoring counsel's requests for information, it was reported that Mr. Al Dossari was being held in the Naval Hospital.[17]

## II. There is No Substantial Injury to Respondents

The modest relief sought herein (no request is being made to stop abusive interrogations, for example) will not cause an undue burden to Respondents. While Respondents' actions have seemingly been designed to bring about a gravely dangerous deterioration in Mr. Al Dossari's psychiatric condition, it is actually in Respondents' interest to keep Mr. Al Dossari from killing himself. As such, it is in Respondents' interest – rather than being a burden to them – to take at least a few meaningful, if modest, steps to improve Mr. Al Dossari's mental state.

Notably, Dr. Grassian concluded that the measures requested herein are "minimal measures – far less than is ordinarily provided to inmates in solitary confinement – and are entirely necessary from a medical and psychiatric perspective, as a means of decreasing the intensity of Mr. Al Dossari's self-destructive feelings, and decreasing the likelihood of further suicidal behavior." Grassian Decl. ¶ 52.

[17] While Respondents have taken the position that visits to the detainee hospital are not permitted (except by the press), the Naval Hospital is a facility that serves even civilians working at Guantánamo and thus there would be no basis to preclude visits to that facility. In the event that Mr. Al Dossari has been transferred to the detainee hospital, counsel would seek to visit him there.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

Respondents will undoubtedly protest that the awarding of any relief – even allowing Mr. Al Dossari to read *Puss in Boots* or exercise regularly alone in a cage – will impede base operations, compromise force security, and detract from the global fight against terrorism. Any such hyperbolic claims must be evaluated in light of the Court's order issued over a year ago that created, *inter alia,* procedures for: counsel visits to Guantánamo; handling attorney-detainee mail; handling presumptively classified attorney notes; and the provision of non-legal documents by counsel to detainees. The issuance of this order did mark a sea change in operations at Guantánamo, yet it did not bring about any of the nearly apocalyptic consequences that Respondents will likely claim would result from easing Mr. Al Dossari's isolation. Viewed in this context – as they must be – counsel's requests that Mr. Al Dossari be given an English/Arabic textbook, be allowed to speak to family, and have several hours of dimmed light for sleeping, could not be more narrowly tailored to preserve his life without causing an undue burden.

## III. Granting the Relief Sought Satisfies a Strong Public Interest

It is not in the interest of the public (or even Respondents, as addressed) to have Mr. Al Dossari's psychiatric state deteriorate further or to have Mr. Al Dossari attempt to kill himself again. Indeed, considering that outside the United States there is essentially universal suspicion and disapproval of Guantánamo, the death of a Guantánamo inmate would have only harmful consequences for the United States, including as a strategic matter. In this sense, there is a very strong public interest in ensuring that such deaths do not occur. In the words of the Court, "[i]t can hardly serve either the national security interests of this country or enhance its image throughout the world to contribute in any way to the death of a detainee in its custody." *Al-Joudi et al.*, 2005 WL 774847, at *13.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

**IV. The Stay Does not Preclude the Relief Requested but, if Necessary, the Court should Modify the Stay**

Although the Court has ordered that the proceedings in this case are stayed pending resolution of all appeals, the stay should not preclude this Court from considering and granting Mr. Al Dossari's motion. This motion is not directed at the issue of the lawfulness of Mr. Al Dossari's detention, but relates to the conditions of his confinement. In fact, Mr. Al Dossari seeks nothing other than to maintain the status quo of this action by preserving his health. 13 *Moore's Federal Practice 3d*, § 65.20 (2004) (fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action").

In any event, the Court is fully empowered to modify the stay for the purpose of considering and resolving Mr. Al Dossari's motion. As the U.S. District Court for the District of Columbia has held, "the same court that imposes a stay of litigation has the inherent power and discretion to lift the stay," especially where circumstances are such that maintenance of the stay is "inappropriate." *Marsh v. Johnson*, 263 F. Supp. 2d 49, 52 (D.D.C. 2003). The circumstances here are such that the Court should exercise its discretion to modify the stay to consider and resolve Mr. Al Dossari's motion for a temporary restraining order and preliminary injunction.

Approved by DoD for public filing
November 4, 2005
Protected Information redacted in black

## CONCLUSION

Mr. Al Dossari is in grave need of help, but will not receive any absent an order of this Court. For all of the foregoing reasons, Mr. Al Dossari respectfully requests that his application be granted.

Dated: October 31, 2005

Respectfully submitted,

DORSEY & WHITNEY LLP

By: /s/ Seth B. Waxman
Seth B. Waxman (D.C. Bar No. 456156)
Mark S. Sullivan*
Christopher Karagheuzoff*
Joshua Colangelo-Bryan*
250 Park Avenue
New York, NY 10177
(212) 415-9200

Counsel for Petitioners

CENTER FOR CONSTITUTIONAL RIGHTS
Barbara Olshansky
666 Broadway, 7th Floor
New York, NY 10012

Co-counsel for Petitioners

*Admitted *pro hac vice*